# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| ABDIKANI MAHAMOUD, et al., | : | |
| | | **(CONSOLIDATED)** |
| Plaintiffs, | : | **Case No. 2:06-cv-0415** |
| v. | : | **Judge Holschuh** |
| ROBERT MUELLER, et al., | : | **Magistrate Judge Kemp** |
| Defendants. | : | |
| | : | |

## MEMORANDUM OPINION AND ORDER

This immigration and naturalization matter is before the Court on a motion to dismiss for lack of subject matter jurisdiction or to remand back to the Bureau of Citizenship and Immigration Services ("CIS"), filed by the defendants Robert Mueller, Director of the Federal Bureau of Investigation; Michael Chertoff, Secretary of the Department of Homeland Security; Alberto Gonzales, United States Attorney General;[1] and Emilio T. Gonzalez, Director of the United States Citizenship and Immigration Services (collectively known as "defendants"). The motion to dismiss covers a number of cases that have been consolidated under Case No. 2:06-cv-415. (Order Consolidating Cases (doc. 7)).

The consolidated cases share the following elements: (1) the plaintiffs are applicants for citizenship through naturalization; (2) the plaintiffs' naturalization applications await adjudication because the Federal Bureau of Investigation ("FBI") has failed to complete a full criminal background check (specifically a name check) of each individual applicant; and (3) the plaintiffs are requesting that the Court conduct a hearing to examine the plaintiffs' naturalization applications, or alternatively, remand the plaintiffs' claims to the CIS with instructions to expedite their applications. The defendants moved to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(1) arguing

---

[1] Mr. Gonzales resigned as the United States Attorney General on September 17, 2007. Peter D. Keisler is the acting Attorney General of the United States. Pursuant to Fed.R.Civ.P. 25(d), where a public officer is a party to an action and during its pendency resigns, "the action does not abate and the officer's successor is automatically substituted as a party."

that the Court lacks subject-matter jurisdiction.  The motion is fully briefed and ripe for adjudication.  For the following reasons, the defendants' motion to dismiss for lack of subject matter jurisdiction or to remand will be granted in part.  The case will be remanded back to the CIS with instructions.

I.

The plaintiffs in each of these consolidated cases have similar backgrounds relating to their applications for citizenship through naturalization.  For the sake of simplicity, the Court will describe Abdikani Mahamoud's case because it is typical of the problems encountered by all the plaintiffs in having their applications adjudicated.  The following facts are not disputed.

Mr. Mahamoud is a lawful permanent resident of the United States residing in Columbus, Ohio.  He originally applied for naturalization on or about August 5, 2004 and was interviewed on March 11, 2005.  Mr. Mahamoud subsequently received a N-652 Naturalization Interview Results form that stated "[a] decision cannot be made about your application."  After further inquiry, Mr. Mahamoud discovered that due to a backlog, the CIS was waiting for the FBI to return his criminal background check.  Specifically, he discovered that his name was not yet processed by the FBI's name check program.[2]  Mr. Mahamoud also learned that he could not be naturalized until the FBI

---

[2] Cheryl Gallegos, the officer in charge of the Columbus CIS sub-office, stated that the name check is one part of the FBI criminal background check performed prior to naturalization.  She stated:

> When a lawful permanent resident alien applies for naturalization with USCIS, background and security checks must be performed to ensure that the aliens [are] eligible for naturalization and that he or she is not a risk to national security or public safety.  The background and security checks include: (a) a record check of the alien made against [the Department of Homeland Security's] own immigration system; (b) a [FBI] fingerprint check for relevant criminal history records on the alien; (c) a check against [the Department of Homeland Security]-managed Interagency Border Inspection System (IBIS), which contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies, including the Central Intelligence Agency, FBI, other divisions of the United States Departments of Justice, State and Homeland Security including, *inter alia*, the United States Customs and Border Protections; and (d) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily

background check was completed. To this date, Mr. Mahamoud's name has not been processed by the FBI's name check program, and he has not been naturalized.

## II.

Motions to dismiss for lack of subject-matter jurisdiction are governed by Fed. R. Civ. P. 12(b)(1). Such motions may be divided into two categories: facial attacks and factual attacks. See Ohio National Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir.1990). In either case, the plaintiff has the burden of showing that subject-matter jurisdiction exists. See Moir v. Greater Cleveland Reg'l Transit Auth., 895 F.2d 266, 269 (6th Cir.1990) (citing Rogers v. Stratton Industries, Inc., 798 F.2d 913, 915 (6th Cir.1986))("[W]here subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion").

Facial attacks are evaluated by questioning the sufficiency of the pleading. The Court is to review the allegations in the complaint as true, similar to a 12(b)(6) motion to dismiss, to determine if the Court has subject-matter jurisdiction. Id. In contrast, to evaluate a factual attack, a determination of jurisdiction is made by weighing the evidence. See Golden v. Gorno Bros., Inc., 410 F.3d 879, 881 (6th Cir.2005) (affirming lack of subject-matter jurisdiction because of correct factual attack on the court's jurisdiction); DLX, Inc. v. Kentucky, 381 F.3d 511, 516 (6th Cir.2004); see also RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1134 (6th Cir.1996). Factual attacks may be resolved using evidence in the form of affidavits and documents.

In the instant case, the defendants argue that, under a factual attack, this Court lacks jurisdiction to adjudicate the plaintiffs' claims. (Def. Supp. Memo. in Supp. of Mot. to Dis. at p. 4, n.1 (doc. #22)). Although not mentioned in the complaint as grounds for jurisdiction, the defendants argue that 8 U.S.C. § 1447(b) is the exclusive basis for this Court's jurisdiction, and under that statute, the Court lacks jurisdiction because the 120-day period to approve or deny a naturalization application following the completion of the examination (the trigger for federal court jurisdiction) has not commenced or elapsed. Specifically, the defendants argue that the examination

---

revealed by the FBI's fingerprint check or IBIS.

(Aff. of Cheryl Gallegos, ¶ 8 (doc. #4, ex. 1)).

includes both the interview and the FBI background check, and therefore the 120-day time period described in 8 U.S.C. § 1447(b) does not commence until both have been completed.

It appears that the plaintiffs agree that 8 U.S.C. § 1447(b) is the jurisdictional statute relevant to the instant case.[3]  (See, e.g., Pl. Supp. Memo. in Opp. to Def. Mot. to Dis. at p. 3 (doc. #23)).  The plaintiffs disagree, however, on whether the 120-day window period has elapsed.  They argue that the examination includes only the interview, so the 120-day window period commenced after the interview and has now expired.

The issue in this case, therefore, is whether the examination described in 8 U.S.C. § 1447(b) includes (1) the interview or (2) the interview *and* the FBI criminal background check.  The scope and extent of the term "examination" will determine whether the 120-day statutory time period has elapsed and whether this Court has jurisdiction.  The Court's analysis begins with 8 U.S.C. § 1447(b).

8 U.S.C. § 1447(b) states:

> If there is a failure to make a determination under section 1446 of this title before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter.  Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service[4] to determine the matter.

8 U.S.C. § 1447(b)(footnote added for clarification).  The section referenced therein, 8 U.S.C. § 1446, which is titled "Investigation of applicants; examination of applications" states, in relevant

---

[3] The Court notes that in the complaint the plaintiffs assert jurisdiction under the mandamus statute, 28 U.S.C. § 1361; the Administrative Procedures Act, 5 U.S.C. § 706; the Declaratory Judgment Act, 28 U.S.C. § 2201 and the federal question statute, 28 U.S.C. § 1331.  Because the parties agree that 8 U.S.C. § 1447(b) is the appropriate statute, however, the Court will not examine whether jurisdiction is proper under the other identified statutes and laws.

[4] In the code and the regulations, the term "service" refers to "the Immigration and Naturalization Service of the Department of Justice."  8 U.S.C. § 1101(a)(34).  The Court notes, however, that in 2002, Congress abolished the former Immigration and Naturalization Services and transferred its functions to several successor agencies located within the Department of Homeland Security.  See 8 U.S.C. § 1551, Historical and Statutory Notes.  One of those successor agencies is the CIS.

part:

>(a) Before a person may be naturalized, an employee of the Service, or of the United States designated by the Attorney General, shall conduct a personal investigation of the person applying for naturalization in the vicinity or vicinities in which such person has maintained his actual place of abode and in the vicinity or vicinities in which such person has been employed or has engaged in business or work for at least five years immediately preceding the filing of his application for naturalization. The Attorney General may, in his discretion, waive a personal investigation in an individual case or in such cases or classes of cases as may be designated by him.
>
>(b) The Attorney General shall designate employees of the Service to conduct examinations upon applications for naturalization. For such purposes any such employee so designated is authorized to take testimony concerning any matter touching or in any way affecting the admissibility of any applicant for naturalization, to administer oaths, including the oath of the applicant for naturalization, and to require by subpena [sic] the attendance and testimony of witnesses, including applicant, before such employee so designated and the production of relevant books, papers, and documents, and to that end may invoke the aid of any district court of the United States; and any such court may, in the event of neglect or refusal to respond to a subpena [sic] issued by any such employee so designated or refusal to testify before such employee so designated issue an order requiring such person to appear before such employee so designated, produce relevant books, papers, and documents if demanded, and testify; and any failure to obey such order of the court may be punished by the court as a contempt thereof. The record of the examination authorized by this subsection shall be admissible as evidence in any hearing conducted by an immigration officer under section 1447(a) of this title. Any such employee shall, at the examination, inform the applicant of the remedies available to the applicant under section 1447 of this title.

8 U.S.C. § 1446(b). Moreover, the examination and investigation outlined in § 1446, as well as the statutory time period announced in § 1447, are further described and supplemented by the Code of Federal Regulations. The relevant regulations are 8 C.F.R. §§ 335.2 and 335.3, which state, in pertinent part:

>**§335.2 Examination of applicant.**
>
>(a) *General*. Subsequent to the filing of an application for naturalization, each applicant shall appear in person before a Service

officer designated to conduct examinations pursuant to §335.1 of this chapter. The examination shall be uniform throughout the United States and shall encompass all factors relating to the applicant's eligibility for naturalization. The applicant may request the presence of an attorney or representative who has filed an appearance in accordance with part 292 of this chapter.

(b) *Completion of criminal background checks before examination.* The Service will notify applicants for naturalization to appear before a Service officer for initial examination on the naturalization application only after the Service has received a definitive response from the [FBI] that a full criminal background of an applicant has been completed. \*\*\*

(c) *Procedure.* Prior to the beginning of the examination, the Service officer shall make known to the applicant the official capacity in which the officer is conducting the examination. The applicant shall be questioned, under oath or affirmation, in setting apart from the public. Whenever necessary, the examining officer shall correct written answers in the application for naturalization to conform to the oral statements made under oath or affirmation. The Service officer shall maintain, for the record, brief notations of the examination for naturalization. At a minimum, the notations shall include a record of the test administered to the applicant on English literacy and basic knowledge of the history and government of the United States. \*\*\* The questions to the applicant shall be repeated in different form and elaborated, if necessary, until the officer conducting the examination is satisfied that the applicant either fully understands the questions or is unable to understand English. The applicant and the Service shall have the right to present such oral and documentary evidence and to conduct such cross-examination as may be required for a full and true disclosure of the facts.

\*\*\*

(e) *Record of examination.* At the conclusion of the examination, all corrections made on the application form and supplemental material shall be consecutively numbered and listed in the space provided on the applicant's affidavit contained in the application form. \*\*\*

**§335.3 Determination on application; continuance of examination.**

(a) The Service officer shall grant the application if the applicant has

6

> complied with all requirements for naturalization under this chapter. A decision to grant or deny the application shall be made at the time of the initial examination or within 120-days after the date of the initial examination of the applicant for naturalization under §335.2.

When analyzing the plain language of the statutes and regulations to determine the scope of the pre-naturalization "examination," courts are divided as to whether the term includes solely the interview or the interview with the FBI criminal background check. Compare, e.g., Danilov v. Aguirre, 370 F.Supp.2d 441 (E.D.Va.2005)(examination is a process that includes the interview and FBI background check) and Damra v. Chertoff, No. 1:05cv0929, 2006 WL 1786246 (N.D.Ohio June 23, 2006)(unpublished)(same) with Affaneh v. Hansen, No. C-3-06-267, 2007 WL 295474 (S.D. Ohio Jan. 29, 2007)(unpublished)(examination is the interview only) and Syed v. Chertoff, No. H-06-0506, 2007 WL 1080100 (S.D.Tex. Apr. 9, 2007)(unpublished)(same). The plaintiffs in both Danilov and Affaneh are identical to those in this case, i.e. naturalization applicants arguing that the examination includes only the interview and therefore filed suit in district court because the 120-day period from the interview had expired.

In Danilov, the court held that the 120-day period did not commence because the "examination is not a single event, but instead is essentially a *process* the agency follows to gather information concerning the applicant." Danilov, 370 F.Supp.2d at 443 (emphasis in original). The court stated:

> The answer to this question is found in the statute itself, as elucidated in the CIS implementing regulations. To begin with, § 1446(b) makes clear that an examination is not a single event, but instead is essentially a *process* the agency follows to gather information concerning the applicant. Thus the statute provides that an "examination" may include the issuance of subpoenas to compel the attendance and testimony of witnesses and the production of relevant papers, books and documents and the taking of testimony concerning any matter touching or affecting the admissibility of any applicant for naturalization. Significantly, Congress, more recently, has added another, very important requirement for the examination process: Effective beginning in fiscal year 1998, Congress now requires completion and review of an FBI criminal background investigation of the applicant as part of the examination process. To implement this additional requirement, the responsible agency adopted a regulation requiring that the FBI complete a criminal background investigation of an applicant *before* the examination may be

7

> completed. And, importantly, these regulations are entitled to *Chevron* [*U.S.A. Inc. v. Natural Resources Def. Council, Inc.*] deference as an authoritative interpretation of the statute unless, as is not true here, it appears from the statute or its legislative history that the agency's interpretation is not one that Congress would have sanctioned.
>
> From this, it follows, as the defendants correctly contend, that the interview of plaintiff that occurred in January 2004 did not end the statutorily-required "examination" and thus trigger the running of the 120 day period, since the interview occurred long before CIS received plaintiff's FBI background investigation. Rather, the January 2004 interview is merely a part of the overall examination process, as is a review of plaintiff's FBI background investigation, and the 120 day period does not begin to run until these and all other aspects of the examination process are completed. In this case, therefore, the 120 day period began to run, at the earliest, on March 24, 2005, the date on which CIS received the FBI background investigation of plaintiff.

Id. at 444 (emphasis in original; footnotes and internal citations omitted).

On the other hand, the opposing view, as articulated in Affaneh, is that the "examination" includes only the interview.[5] The Affaneh court stated:

> However, other courts have determined that the 120-day period begins with the examination and not upon the completion of the examination and the background checks. In *Daami v. Gonzales*, No. 05-3667, 2006 WL 1457862 (D.N.J. May 22, 2006), [sic] offered several reasons for this conclusion. First, the fact that section

---

[5] The conclusion that the examination includes only the interview appears to be the majority view. See, e.g., Repeshchuk v. Gonzales, Civ. No. 07-2017 (RHK/AJB), 2007 WL 2361450 (D.Minn. Aug. 15, 2007)(unpublished)(rejecting Danilov and holding the 120-day statutory time period begins to run after the interview); Ali v. Chertoff, No. 1:07cv470 (JCC), 2007 WL 2344987 (E.D. Va. Aug. 14, 2007)(unpublished)(same); Ali v. Gonzales, No. C07-591MJP, 2007 WL 2288058 (W.D. Wash. Aug. 6, 2007)(unpublished)(same); Farooq v. Hansen, No. 1:07-cv-0946, 2007 WL 2177890 (N.D. Ohio July 27, 2007)(unpublished(same); Yang v. Chertoff, No. 07cv0241 JM(CAB), 2007 WL 1974943 (S.D. Cal. July 2, 2007)(unpublished)(same); Al-Farisi v. Mueller, 492 F.Supp.2d 335 (S.D.N.Y.2007)(same); Silebi De Donado v. Swacina, 486 F.Supp.2d 1360 (S.D.Fla.2007)(same); Issa v. Mueller, 486 F.Supp.2d 668 (E.D.Mich.2007)(same); Lin v. Secretary, U.S. Dept. of Homeland Security, 485 F.Supp.2d 263 (W.D.N.Y.2007)(same); Negam v. United States, 480 F.Supp.2d 877 (N.D.Texas 2007)(same); Mahd v. Chertoff, No. 06-cv-01023-WDM-PAC, 2007 WL 891867 (D.Colo. March 22, 2007)(unpublished)(same).

8

>1447(b) states that the 120 day period begins to run on "the date on which the examination is conducted" strongly implies that there is one date on which the examination takes place. *Id*. at *5. Second, since sections 1446(b), (c), and (d) discuss the examination separately from the investigation discussed in sections 1446(a), the investigation must be separate from the examination. *Id*. Third, the implementing regulations differentiate between the "examination" and the "criminal background checks." *Id*. For example, 8 C.F.R. § 335.2 is entitled "Completion of criminal background checks before examination" and specifically states that the FBI background check must be completed before the applicant is notified to appear for the examination. *Id.* (citing 8 C.F.R. § 335.2(b)). In another example, section 335.3 (b) allows the Service officer to "continue the initial examination on an application for one reexamination, to afford the applicant an opportunity to overcome deficiencies on the application that may arise during the examination." *Id*. The *Daami* court understood this to mean that there is an initial examination after which there may be "one reexamination" and there would be no purpose to specifically permit "one reexamination" if examination means the entire examination process. *Id*. Finally, another section of the CFR states in part: "A decision to grant or deny the application shall be made at the time of the initial examination or within 120 days after the date of the initial examination.["] *Id*. at *6. By express terms, this code section instructs the Service that the 120-day period begins to run after the initial examination and not after the conclusion of the entire examination process. *Id*.

Affaneh, 2007 WL 295474, * 3.

Moreover, at least one Court of Appeals has recently expressly rejected Danilov and adopted the majority view. See Walji v. Gonzales, __ F.3d __, 2007 WL 2685028 (5th Cir. September 14, 2007). The Walji court first noted that the express statutory language of 8 U.S.C. § 1447(b) supports the argument that the examination occurs on one particular date so that it cannot involve a process that includes, inter alia, a full criminal background check. Id. at *3. The Court stated that "the plain language suggests that the examination is a distinct, single event - the date on which the interview occurs - triggering the 120-day period, and not an ongoing fluid process encompassing the interview as well as the background investigation." Id.

The Court of Appeals determined:

>[T]he statutory scheme contemplates a distinction between the investigation and the examination, the latter being a discrete rather

9

> than a continuous event. The organization of the INA section preceding § 1447 indicates that the investigative process is separate from the examination. See 8 U.S.C. § 1446 (entitled "Investigation of applicants; examination of applications," with subsection (a) referencing what is required for the CIS *investigation* of the applicant and subsection (b) separately addressing the procedural requirements for the *examination* of the applicant). Section 1446 further differentiates between the two procedures. Whereas an "examination" must be conducted by an employee of CIS designated by the Attorney General, an "investigation" may be conducted by an employee of CIS or an employee of the United States the Attorney General designates. *Id.*

Id. (emphasis in original).

Furthermore, Walji pointed out that the legislative history suggests that the 120-day statutory time period commences after the Service conducts the interview. The court examined a House of Representatives Committee on the Judiciary report and stated:

> The report explains that "[t]he bill provides that the applicant may petition the court after 90 days of the interview on an application if a decision has not been made on the case." The report continues: "[i]t is expected that INS will move expeditiously after full investigation of the facts to calendar cases for examination to decision." This makes it clear that the term "examination" referred to the CIS's interview of an applicant. When Congress later established a 120-day limit in 1990, it used virtually identical language as that used in the proposed 1989 legislation.
>
> Further, we believe the definition of "examination" in § 1447(b) urged by the Government, which would permit virtually unbounded time to respond to naturalization applications, is contrary to the intended purpose of Congress in passing the Immigration and Nationality Act. A central purpose of the statute was to reduce the waiting time for naturalization applicants.

Id. (internal citations and emphasis omitted).

Comparing the reasoning and rationale outlined in, for example, Affaneh and Walji, to that announced in Danilov, this Court concludes that the 120-day statutory time period begins to run after the CIS conducts the interview, not after the CIS conducts the interview *and* receives the FBI background check. First, the plain language of § 1447(b) reveals that the "examination" is a singular event, not an on-going and fluid process. The code states that the 120-day period will commence

10

"after *the date* on which the examination is conducted ...." 8 U.S.C. § 1447(b)(emphasis added). This indicates that the examination cannot be a series of events with no definite end date; rather, the examination must be a single event that occurs on an identifiable day.  If, as the government suggests, the Congress intended that the 120-day time period commence after a series of events occur, the Congress could have used different language to express that intent.  Instead, the Congress chose a single day ("the date") as the triggering event for the time period to run, which suggests that the examination is an interview only.

Second, the division of 8 U.S.C. § 1446 into two distinct sections - the *investigation* as described in § 1446(a) and the *examination* as described in §§ 1446(b)-(d) - supports the argument that the investigation, including the FBI criminal background check, is statutorily distinct and separate from the examination/interview.  Because the examination and investigation are two separate events, lumping them together would ignore t the statutory distinction.  Moreover, it would add additional meaning to § 1447(b)'s plain language that the 120-day clock begins to run "after the date on which the examination is conducted" (versus, for example, "after the date on which the examination and investigation are conducted").  By statutorily separating the two actions, it clearly appears that the investigation is different from the examination.

Third, the plain language of 8 C.F.R. § 335.3 supports the conclusion that the examination includes only the interview.  The relevant part of § 335.3(a) states that "[a] decision to grant or deny the application shall be made at the time of the initial examination or within 120-days after the date of the initial examination ...."  Subsection (b) clarifies that, rather than dismiss a naturalization applicant if the CIS discovers deficiencies during the interview, "the Service officer may continue the initial examination of an application for one reexamination, to afford the applicant an opportunity to overcome deficiencies on the application that may arise during the examination." Applying § 335.3(b)'s "during the examination" to § 335.3(a)'s "initial examination" suggests that the "examination" is solely an interview-type event that, when concluded, will trigger the 120-day window.  Moreover, the fact that the regulations allow for one reexamination supports the position that the examination is an interview, not an interview and a background check, so that, any potential deficiencies revealed in the first interview/examination may be corrected in a second interview/examination.

Finally, 8 C.F.R. §§ 335.2(a) and (b) are evidence of a difference between the background

11

check and the interview. Namely, § 335.2(b) is entitled, "Completion of criminal background check before examination." This regulation's plain language indicates that the examination is distinct and separate from the FBI criminal background check. In fact, the subsection states that the examination occurs "only after the Service has received a definitive response from the [FBI] that a full criminal background check of an applicant has been completed." 8 C.F.R. § 335.2(b). The language suggests that the examination and FBI criminal background check are not one-and-the-same. Although 8 C.F.R. § 335.2(b) provides that the initial examination is to be made only after the CIS has received a response from the FBI that a full criminal background of an applicant has been completed, the fact that the CIS has chosen to expedite the investigative process by conducting the interview prior to receipt of the report does not supercede the fact that the relevant statutes clearly show that the required statutory examination refers only to the applicant interview.

Accordingly, the Court concludes that the examination includes the interview only, not the interview and the background check. Further, the Court notes that the 120-day time period established in § 1447(b) has expired for the plaintiffs in this case. Because the plaintiffs have a statutory right to bring suit in this Court pursuant to 8 U.S.C. § 1447(b), the defendants' motion to dismiss for lack of subject-matter jurisdiction is denied, but the motion to remand will be granted because, although the Court has statutory authority to adjudicate naturalization applications in this procedural posture, the Court, in its opinion, is not equipped to handle the examination process in this manner. See, e.g., Repeshchuk v. Gonzales, Civ. No. 07-2017 (RHK/AJB), 2007 WL 2361450, *4 (D.Minn. Aug. 15, 2007)(noting that a court is not equipped to process naturalization applications).

III.

Based on the foregoing, the defendants' motion to dismiss for lack of subject matter jurisdiction or to remand (doc. #4) is GRANTED IN PART. This case will be remanded back to the CIS with instructions. Additionally, the Court notes that this Order applies to all the consolidated cases.

It is obvious from the evidence in the record that the failure to provide a full criminal FBI background check in a timely manner is due to the backlog of processing names through the name check program. (Dec. of Michael A. Cannon, ¶¶ 16-25 (doc. 22, ex. A)). According to Michael Cannon, the FBI section chief for the name check program, the backlog is a result of numerous

factors, including, inter alia, lack of financial resources to provide the manpower or purchase the technology necessary to process the requests. (Id. ¶¶ 26-35 (doc. 22, ex. A)).[6] Having the FBI

---

[6] Mr. Cannon stated:

> Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks. As of April 30, 2007, for fiscal year 2007, the FBI has completed over 2.0 million name check requests.
>
> \*\*\*
>
> In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Services's (INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.
>
> \*\*\*
>
> There are numerous factors that contribute to delays in the processing of name check requests. One is the volume of incoming name checks - the total volume of incoming name check requests currently outpaces the [name check program's] available resources to process the incoming volume, in addition to being able to process those name checks currently pending. As of April 30, 2007, the [name check program] has received over 2.1 million name check requests. The number of incoming name check requests averages approximately 71,000 per week, and the number of completed name check requests averages approximately 68,000 name checks per week.

13

criminal background checks, including the name checks, completed in a reasonable and timely manner is essential to the naturalization application statutory structure regardless of whether the CIS chooses to examine an applicant prior to receiving a definitive response from the FBI that a full criminal background check has been completed. A clogged system that is processing less names per week than it is receiving impairs the entire statutory process for obtaining citizenship through naturalization.[7]

Accordingly, on remand of this case, it is anticipated that the Attorney General of the United States and the FBI will continue an effort to obtain the funding and resources necessary to assist in the elimination of the current backlog of processing names through the name check program. The CIS is therefore instructed to obtain a report from the Director of the Federal Bureau of Investigation and submit it to the Court within 90 days from the date of this Order on (1) what efforts are currently being made to obtain the resources necessary to reduce or eliminate the delays in the FBI's name check program; (2) what order of priorities exists with reference to requests for name check clearance, including requests from CIS; and (3) the dates the requests from CIS for name check clearance for each of the plaintiffs in these consolidated cases were received by the FBI and the anticipated time the processing of these requests will be completed.

The STAY issued cases 2:06-cv-415 (doc. #8), 2:06-cv-416 (doc. #13),  2:06-cv-601 (doc. #12), 2:06-cv-602 (doc. #12), 2:06-cv-750 (doc. #9), 2:06-cv-787 (doc. #9), 2:06-cv-1061 (doc.

---

(Dec. of Michael A. Cannon, ¶¶ 16, 18, 21 (doc. 22, ex. A)).

[7] Clearing a name through the FBI name check program is also important in other aspects of government, such as

> Government employment or an appointment, a security clearance, attendance at a White House function, a 'green card' ... admission to the bar, or a visa.  More than 70 federal, state, and local agencies regularly request FBI name searches.  In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

(Id. ¶ 4 (doc. 22, ex. A)).

#13), and 2:07-cv-012 (doc. #14) is LIFTED, and the case is remanded to the CIS to proceed in accordance with the instructions set forth in this Order.

**IT IS SO ORDERED.**

Date: November 1, 2007                                        /s/ John D. Holschuh
                                                             John D. Holschuh, Judge
                                                             United States District Court